## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

NINA S. BOYD,                                          )
                                                      )
                          Plaintiff,                  )
                                                      )
        v.                                            )        Case No. 06-2115-KGS
                                                      )
U.S. BANK NATIONAL ASSOCIATION,                       )
                                                      )
                          Defendant.                  )

## MEMORANDUM AND ORDER

This matter comes before the court upon defendant's Motion for Summary Judgment (Doc. 37) and accompanying Memorandum in Support (Doc. 38). Defendant has filed a response (Doc. 45) to which plaintiff has filed a reply (Doc. 53). Defendant's Motion to Enforce Jury Waiver Provision and to Strike Jury Demand (Doc. 31) is also pending before the court. Plaintiff has filed a response (Doc. 33) to which defendant has filed a timely reply (Doc. 35). As a result, the court finds the instant motions ripe for disposition and is prepared to rule.

**I.      Motion for Summary Judgment (Doc. 37).**

In the present motion, defendant seeks summary judgment as to plaintiff's claims of (1) violation of the Equal Credit Opportunity Act ("ECOA")[1] and (2) negligent loan administration. Defendant also moves for summary judgment on its counterclaim to collect the debt owed under the guaranty ("the Guaranty"). As detailed below, defendant's Motion for Summary Judgment is granted in part and denied in part while defendant's Motion to Enforce Jury Waiver is granted.[2]

**A.      Summary Judgment Standard**

A court grants a motion for summary judgment under Fed. R. Civ. P. 56 if a genuine issue of material fact does not exist and if the movant is entitled to judgment as a matter of law. The court is to

---

[1] 15 U.S.C. § 1691 *et seq*,; Regulation B, 12 C.F.R. § 202.7(d).

[2] As to both motions, the court has considered all of the arguments presented by the parties, although they are not all discussed herein.

determine "whether there is the need for a trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[3]   "Only disputes over facts that might affect the outcome of the suit under the governing law will . . . preclude summary judgment."[4]  There are no genuine issues for trial if the record taken as a whole would not persuade a rational trier of fact to find for the nonmoving party.[5]

More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed. R. Civ. P. 1."[6] At the same time, a summary judgment motion does not empower a court to act as the jury and determine witness credibility, weigh the evidence, or choose between competing inferences.[7]

On a motion for summary judgment, the "judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."[8]  The standard for summary judgment mirrors the standard for directed verdict.  The court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."[9]  "If the [c]ourt concludes a fair-minded jury could not return a verdict in favor of the nonmoving party based on the evidence presented, it may enter a summary judgment."[10]

---

[3]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

[4]*Id.*

[5]*Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[6]*Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

[7]*Windon Third Oil and Gas v. Federal Deposit Ins.*, 805 F.2d 342, 346 (10th Cir. 1986), *cert. denied*, 480 U.S. 947 (1987).

[8] *Liberty Lobby,* 477 U.S. at 249.

[9] *Id.* at 251-52.

[10] *Anderson v. City of Cleveland*, 90 F. Supp. 2d 906, 907-08 (E.D. Tenn. 2000), *citing Anderson v. Liberty Lobby*, 477 U.S. at 251-52.

**B.      Factual Background**

Nina Boyd ("Ms. Boyd" or plaintiff), is, and was during all times relevant to this case, the spouse of Chris Boyd ("Mr. Boyd").

In late 2003, Mr. Boyd formed Encore Products LLC ("Encore") to manufacture and sell flavored popcorn in tins. Encore was operated pursuant to an Operating Agreement ("Operating Agreement") and was initially financed solely from Mr. Boyd's capital contributions.

Mr. Boyd hired Kert Rabe ("Mr. Rabe") as the president of Encore after introduction and recommendation by a mutual acquaintance and after receiving three references from workers at Golden Harvest, Rabe's previous employer.  Mr. Boyd never conducted a background check on Mr. Rabe and never received or reviewed Mr. Rabe's resume.

In February of 2004, Mr. Boyd sought an unsecured line of credit loan ($3.2 million) (the "Line") and an unsecured equipment loan ($600,000) (the "Term Loan") for Encore from defendant (collectively the "Encore Loans").  In addition to the Encore Loans, defendant offered to make Mr. Boyd a $1,200,000 personal loan to be secured by liquid assets, but Mr. Boyd declined.

On March 5, 2004, Tim Stacy prepared a "Standard Credit Display Executive Summary" ("Credit Summary") for the 3.2 million dollar line of credit for the Encore Loans and on March 18, 2004, Mark Jorgeson and Joseph Imbus approved the Credit Summary.  The Credit Summary stated that "Chris Boyd's personal financial statement reports $2 MM in liquid assets after his investment in the Company of $1.6 MM." On that same page, the Credit Summary also states the "Guarantor will be required to enter into a liquidity maintenance agreement of $2MM to further reduce the risk associated with this start-up venture." Under "Guarantor Analysis" the Credit Summary lists only Chris Boyd.  Also under "Guarantor Analysis" the Credit Summary states Mr. Boyd as having liquid assets of $2,291,000.00 and total assets of $6,036,080.00. This financial information appears to be based upon a "Statement" dated February 9, 2004, which has not been provided to the court.

The Credit Summary assigned a risk rating of "5" to Encore and assigned Mr. Boyd a "Guarantor Rating" of "C." The rating of "5" indicated a high amount of risk in the loan. Plaintiff's name never appears in the Credit Summary and the assets listed as Mr. Boyd's assets do not mention risk of joint ownership by plaintiff. As a result of the risk rating, defendant contends it required a guarantor with liquid assets of at least $2 million. However, the Credit Summary did not bind or preclude the defendant from altering the structure of the transaction to meet the liquidity requirement.

On March 2, 2004, defendant prepared a term sheet (the "Proposed Term Sheet") setting forth the conditions under which defendant was willing to consider making the Encore Loans. The Proposed Term Sheet specifically provides for the "Unlimited guaranty from Chris and Nina Boyd (if assets held in trust, trust would be required to guarantee as well)." Likewise, the commitment (the "Commitment") prepared on March 19, 2004 by Mike Malm on behalf of the Bank makes the same statement regarding the guaranty and also requires a liquidity level of $2,000,000. According to the Credit Summary, approval for the loans was made on March 18, 2004. This Commitment letter agreed to fund the $600,000 for financing of equipment as well as a line of credit totaling 3.2 million dollars as outlined in the Term Sheet. The Commitment from defendant was signed by Mr. Boyd on March 22, 2004–two days before plaintiff and Mr. Boyd executed a Personal Financial Statement.

Both sides agree that sometime before March 22, 2004 defendant received financial information from Mr. Boyd. However, Mr. Boyd testified that prior to March 2, 2004, the date of the Proposed Term Sheet, Mr. Boyd had not provided defendant, either formally or informally, with information about plaintiff's assets nor had defendant asked for such information. Mr. Boyd also testified that between the time of the proposed Term Sheet, the Commitment, and the execution of the Commitment Letter, Mr. Boyd did not provide information to defendant orally or in writing regarding plaintiff or the Boyds' joint financial condition.

Defendant asserts that it required a formal financial statement to confirm that Mr. Boyd could meet the Liquidity Requirement. On March 24, 2004, Mr. Boyd executed and presented a Personal Financial

Statement ("PFS") to defendant.  The financial statement lists Christopher Boyd as the "Applicant" and plaintiff as the "Co-Applicant" and was signed by both.  Defendant did not request that Mr. Boyd provide a joint financial statement, but Mr. Boyd did so because he and plaintiff had joint assets and because he believed the bank needed both of them to execute the PFS.

The PFS lists a variety of financial assets, but aside from a Securities section wherein the form asks for the name under whom the securities are listed, it does not indicate if or which of the assets were owned separately or jointly.

In filling out this form, plaintiff and Mr. Boyd listed the following:

| | |
|---|---|
| Cash: | $1,315,000 |
| Securities: | $885,000 |
| Homestead: | $420,000 |
| Other Real Estate: | $425,000 |
| Profit Sharing & Pension: | $348,000 |
| "Business Ownership–Encore Products" | $935,000[11] |
| Other Assets (Describe) | $1,000,000 –marketable sec. |
| | $278,000–real estate |
| | (Brookwood Partners, Simpson Inv. 6)[12] |

The second page of the PFS provides Schedules to list certain information regarding some of these assets.  The PFS showed a "Net Worth" of  $5,556,000.  The PFS clearly listed the $885,000 in securities as owned by plaintiff, and or plaintiff and her children.  Plaintiff and Mr. Boyd later testified that she did own those securities as well as the $1,000,000 in marketable securities.

Based on the PFS, defendant claims it did not believe Mr. Boyd could satisfy the requirement of maintaining 2 million dollars in liquid marketable assets that defendant had determined was necessary in the event Encore defaulted.  Mark Jorgeson, representative for defendant, attests that the Bank received this PFS on March 24, 2004, but his affidavit is strangely silent as to when, how, or if, the Bank actually reviewed the PFS prior to the execution of the Guaranty.

---

[11]This was handwritten on the form.

[12]The notations next to "Other Assets" were also handwritten.

5

On April 1, 2004, the Guaranty was executed along with several other loan documents (collectively the "Loan Documents"): Revolving Credit Note in the amount of $3,200,000.00; Revolving Credit Agreement; Business Security Agreement; Term Note in the original principal amount of $600,000.00; and Term Loan Agreement.   Mr. Boyd testified that defendant did not explain why it wanted plaintiff's signature.   Mr. Boyd further testified he thought defendant wanted his signature because he was the owner of the business and wanted his wife's guaranty simply because she was his wife.  Mr. Boyd also attested that at no time did defendant inform him he was not creditworthy.   Further, Mr. Boyd testified that the Bank never discussed whether another person or entity could act as a guarantor, other than plaintiff, for the loan.

### 1.      The Borrowing Base Reports

Joe Lagoski, Encore's controller ("Mr. Lagoski"), was responsible for preparing the Borrowing Base Reports ("BBRs") that were submitted to defendant to draw on the Line.   Drawing on the credit Line referred to accessing the cash in the loan account.   In a July 2004 faxed document to defendant, Mr. Lagoski asked defendant to confirm that the information in the BBRs was what was needed for the advance against inventory.   Mr. Lagoski testified that defendant never instructed him on the method for drafting the BBRs, nor did defendant instruct him to reflect cumulative purchase orders as inventory in the BBRs. After receiving the BBRs from Mr. Lagoski, defendant was to advance 80 percent of Encore's eligible receivables and 50 percent of Encore's inventory if the purchase orders supported the inventory.

Mr. Lagoski testified that Mr. Rabe told him to use the total *cumulative* customer purchase orders to support advances on inventory.   The result of reporting the *cumulative* customer purchase orders was that inventory already sold continued to be listed as *inventory* which inflated the inventory figure.   Mr. Boyd testified that defendant advanced substantially more than 50 percent of the inventory and 80 percent of the receivables. After the thirteenth draw on the Encore loan, on October 12, 2004, Encore was out of compliance.

**2.       Relative Roles of Mr. Boyd and Encore's Employees**

Mr. Rabe was responsible for the entire company and was in charge of sales and accounting.  Mr. Lagoski was in charge of accounting.  Mr. Rabe attended meetings with defendant as Encore's president. During the meetings with defendant, Mr. Rabe made presentations regarding Encore, including projections of sales and profits of the company.  Mr. Boyd was aware that Mr. Rabe was an authorized signatory on Encore's bank account (the "Encore Bank Account").  Mr. Boyd authorized Mr. Rabe and Mr. Lagoski to write checks on the Encore Bank Account.

On April 6, 2004, Mr. Rabe executed a Limited Liability Company Certificate of Authority on behalf of Encore.  It states: "we acknowledge that the rights and authority herein granted are in addition to and not limitation of the rights, authority or powers otherwise available to any manager or member as applicable, or other person by law or agreement."  Mr. Boyd did not give Mr. Rabe authority to sign the Limited Liability Company Certificate of Authority, did not sign it himself  and was not aware Mr. Rabe had signed it.

After the first draw on the Line, Mr. Boyd had no day-to-day involvement with Encore. Mr. Boyd stopped by the Encore plant or called the business once or twice per week, did not have a permanent office at the plant, and only had an "informal" involvement in Encore.  Encore's bank statements, which reflected the draws on the Line, were addressed to the attention of Mr. Boyd at Encore and mailed to Encore's plant. Mr. Boyd never requested information about draws that were made on the Line, never asked defendant to decline draws that lacked his signature, never told Mr. Rabe to refrain from drawing on the Line, had no discussion with Mr. Rabe about preparing the BBRs, never asked Mr. Lagoski to refrain from submitting BBRs that Mr. Boyd did not approve, and never made any efforts to stop the submission of draws he did not sign.  However, Mr. Boyd knew that draws were being made on the Line by Mr. Rabe to purchase raw materials needed by Encore, that BBRs were submitted in conjunction with draws on the Line, and that Mr. Rabe was writing checks on the Encore Bank Account.

After thirteen draws on the Line, Encore was not able to continue in business, and defendant foreclosed its security interest in Encore's assets.  After Encore defaulted on the Encore Loans, defendant and Mr. Boyd learned that Mr. Rabe embezzled approximately $1 million from Encore.

Mr. Rabe commenced a Chapter 7 bankruptcy case in the District of Kansas and defendant obtained a judgment against him declaring that the amounts he diverted from Encore were owed to defendant and could not be discharged.  Mr. Boyd, but not plaintiff, also commenced a Chapter 7 bankruptcy case in the District of Kansas and discharged his obligation under the Guaranty to the defendant.  Mr. Boyd did not discover the over-advances on the Encore Line until after he filed Chapter 7 when his trustee was notified of defendant's claims.

On March 28, 2006 plaintiff filed the instant action alleging defendant had violated the ECOA and, as a result, such conduct voided plaintiff's obligation on the Guaranty. On May 30, 2006, defendant filed a counterclaim seeking attorney fees and plaintiff's payment of the Guaranty, which, as of January 25, 2007, totaled principal and interest in the amount of $2,917,747.25, plus per diem interest.  On June 6, 2006, plaintiff filed its answer to defendant's counterclaim, stating, in part, that (1) defendant had violated the ECOA in obtaining plaintiff's guaranty rendering the Guaranty unenforceable and (2) defendant had negligently administered the Encore Loan sufficiently discharging plaintiff's obligation under the loan Guaranty.

## C.      Analysis

As detailed below, the court denies defendant's motion as to plaintiff's ECOA claim and defendant's claim for payment of plaintiff's obligation under the Guaranty, but grants it as to plaintiff's claim of negligent loan administration.  Specifically, the court finds genuine issues of material fact exist as to (1) whether defendant's determination that Mr. Boyd was not independently creditworthy was before it required plaintiff to guaranty the Encore loans;[13] (2) whether Mr. Boyd was independently creditworthy in

---

[13]*FDIC v. Medmark, Inc.*, 897 F. Supp. 511, 515 (D. Kan. 1995)(citing *Riggs Nat'l Bank of Washington D.C. v. Linch*, 36 F.3d 370, 374 (4th Cir. 1994)).

the first place; and (3) whether defendant required plaintiff to act as a guarantor in violation of 12 C.F.R. § 202.7(d).

1.   **The Equal Credit Opportunity Act and Regulation B outline standards for a claim of lending discrimination.**

The Equal Credit Opportunity Act ("ECOA")[14] governs fair lending practices and makes it "unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction . . . on the basis of sex or marital status[.]"[15]

a.   **Regulation B**

As authorized by the ECOA[16], the Federal Reserve Board has promulgated Regulation B, 12 C.F.R. § 202.7(d)(1) which provides in part "[a] creditor shall not require the signature of an applicant's spouse or other person, other than a joint applicant, on a credit instrument if the applicant qualifies *under the creditor's standards of credit worthiness* for the amount and terms of the credit requested."[17]   However, "[a] creditor shall not deem the submission of a joint financial statement or other evidence of jointly held assets as an application for joint credit."[18]

The Official Comments to 12 C.F.R. § 202.7(d) clarifies that "when an applicant requests individual credit, a creditor generally may not require the signature of another person unless the creditor has *first determined* that the *applicant alone* does not qualify for the credit requested."[19]   When an

_____

[14] 15 U.S.C. § 1691 et seq.

[15] 15 U.S.C. § 1691(a).

[16] 15 U.S.C. § 1691b(a).

[17] 12 C.F.R. § 202.7(d)(1)(emphasis added).

[18] *Id.*  Here, while plaintiff and Mr. Boyd submitted in late March 2004 a joint personal financial statement to defendant, defendant does not argue that plaintiff was a "joint applicant." *See e.g.*, Reply (Doc. 53) at p. 13.

[19] 68 Fed. Reg. 13,144 (emphasis added).

individual applicant fails to meet the creditor's standards "the creditor may require a cosigner, guarantor, endorser, or similar party-but *cannot require that it be the spouse*."[20]

Courts generally have held that a creditor is permitted to apply its own criteria for determining creditworthiness as long as it is based on criteria which are valid, reasonable, and non-discriminating with regards to the applicant's marital status.[21]

### b.      12 C.F.R. § 202.7(d)(2)

Under the ECOA, "[c]onsideration of State property laws directly or indirectly affecting creditworthiness shall not constitute discrimination for the purposes of [the ECOA]."  To that end, 12 C.F.R. § 202.7(d)(2) acts as an exception to  § 202.7(d)(1) as to applicants seeking unsecured credit. Specifically,

> [i]f an applicant requests unsecured credit and relies in part upon property that the applicant owns jointly with another person to satisfy the *creditor's standards of creditworthiness*, the creditor may require the signature of the other person only on the instrument(s) necessary, or reasonably believed by the creditor to be necessary, under the law of the state in which the property is located, to enable the creditor to reach the property being relied upon in the event of the death or default of the applicant.[22]

The Official Comments to 12 C.F.R. § 202.7(d)(2) provide further clarification.  Generally, a creditor may not ask a nonapplicant joint-owner to sign "any instrument as a condition of the credit extension unless the applicant's interest does not support the amount and the terms of the credit sought." However, if an applicant seeking unsecured credit does not "own sufficient *separate* property" and "relies on *joint* property to establish creditworthiness" then "the creditor *must value* the applicant's interest in the

---

[20]*Id.* (emphasis added).

[21] *Haynes v. Bank of Wedowee*, 634 F.2d 266, 270 (5th Cir. 1981); *Anderson v. United Finance Co.*, 666 F.2d 1274 (9th Cir. 1982); *Resolution Trust Corp. v. Townsend Assocs.*, 840 F. Supp. 1127, 1141 (E.D. Mich. 1993).
  Defendant and plaintiff both believe this standard applies.  *See e.g.*, Memorandum in Support of Motion for Summary Judgment (Doc. 38) at p. 5 (citing *Haynes*);  Memorandum in Opposition (Doc. 46) at p. 16.

[22]12  C.F.R. § 202.7(d)(2)(emphasis added).

jointly owned property."[23]  To determine the value of an applicant's interest in jointly owned property, "a creditor *may* consider factors such as the form of ownership and the property's susceptibility to attachment, execution, severance, or partition; the value of the applicant's interest after such action and the cost associated with the action."[24] However, in "determining whether a married applicant's interest in jointly owned property is sufficient to satisfy the creditor's standards of creditworthiness for individual credit . . . a creditor may not consider the possibility that the couple may divorce."[25]

As to a corporate loan, a creditor can require all officers of a closely held corporation to "personally guarantee a corporate loan" but "the creditor *may not automatically require that spouses of married officers also sign the guarantee*."[26]   However, "[i]f an evaluation of the financial circumstances of an officer indicates that an additional signature is necessary . . . the creditor may require the signature of another person in appropriate circumstances in accordance with § 202.7(d)(2)."[27]

**c.     12 C.F.R. § 207.2(d)(5)**

12 C.F.R. §207.2(d)(5) provides:

> Additional parties. If, under a *creditor's standards of creditworthiness*, the personal liability of an additional party is *necessary* to support the credit requested, a creditor may request a cosigner, guarantor, endorser, or similar party. The applicant's spouse may serve as an additional party, but the creditor *shall not require* that the spouse be the additional party.[28]

The language of § 202.7(d) makes it clear that §202.7(d)(1) and (d)(5) act separately.  Section 202.7(d)(1) applies "if the applicant *qualifies* under the creditor's standards of creditworthiness for the

---

[23]68 Fed. Reg. 13,144 (emphasis added).

[24]*Id.* (emphasis added).

[25]*Id.*

[26]*Id.* (emphasis added).

[27] *Id.*

[28]12 C.F.R. § 202.7(d)(5)(emphasis added).

amount and terms of the credit requested,"[29] whereas (d)(5) applies if under the creditor's standards of creditworthiness, the personal liability of an additional party is necessary, i.e., the applicant has not met the creditworthiness requirement.[30]

### d.      Burden of Proof

Defendant argues that in an ECOA case, the burden of proof is the same as in a Title VII employment discrimination case.[31]  Plaintiff does not dispute the application of this standard.[32]  Several circuits and district courts outside the Tenth Circuit have, in applying the standard under Title VII, required plaintiff bear the initial burden to prove that the defendant believed the applicant uncreditworthy.[33] One such court held:

> The case law and legislative history of the ECOA establish that in general the burden of proof in ECOA cases is similar to that in Title VII employment discrimination cases. . . . Under this approach the plaintiff has the initial burden of presenting a prima facie case of credit discrimination. If the plaintiff succeeds in establishing a prima facie case, the burden shirts to the defendant to articulate some legitimate, non-discriminatory basis for its action. Finally, should the defendant carry this burden, the plaintiff then has the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were merely a pretext for discrimination. Throughout this process, however, the ultimate burden of persuasion remains with the plaintiff.[34]

---

[29]*Id.* (emphasis added).

[30]Additionally, because § 202.7(d)(1) applies "*[e]xcept as provided in this paragraph . . .* " the court takes this to mean that (d)(1) and (d)(5) act independently.

[31]Memorandum in Support of Motion for Summary Judgment (Doc. 38) at p. 3.

[32]*See e.g.*, Memorandum in Opposition (Doc. 46).

[33] *See Ramsdell v. Bowles*, 64 F.3d 5, 9 (1st Cir. 1995); *Crestar Bank v. Driggs*, No. 93-1036, 1993 U.S. App. LEXIS 14256, *1 (4th Cir. June 11, 1993); *Bolduc v. Beal Bank, SSB*, 994 F. Supp. 82, 94 (D.N.H. 1998); *McGee v. East Ohio Gas Co.*, 111 F. Supp. 2d 979, 984 (S.D. Ohio 2000); *Resolution Trust Corp. v. Townsend Assocs.*, 840 F. Supp. 1127, 1142 (E.D. Mich 1993).

[34]Memorandum in Support of Motion for Summary Judgment (Doc. 38) at p. 3-4 (citing *Armstrong v. Nationwide Mortgage Plan/Trust (In re Armstrong)*, 288 B.R. 404, 423 (Bankr. E.D. Pa. 2003)).

Despite the parties' apparent agreement on the issue, the Tenth Circuit has expressly avoided "the open question" as to whether the Title VII burden shifting analysis of *McDonnell Douglas* applies to ECOA claims.[35]  Yet, while the "Tenth Circuit has not reached the question of whether the *McDonnell Douglas* [Title VII] standard applies in credit discrimination cases . . . it has noted that under either the *McDonnell Douglas* or conventional proof analysis, 'the plaintiff must demonstrate that he or she was a qualified borrower in the first place.'"[36]  Thus, when a plaintiff/applicant fails to establish that the applicant was a qualified borrower in the first place, summary judgment could be appropriate.[37]  Similarly, in *FDIC v. 32 Edwardsville, Inc.*, a published case from the District of Kansas, the court required plaintiff to demonstrate that the defendant's decision to require plaintiff to act as a guarantee for plaintiff's spouse's loan was unreasonable.[38]  Specifically, the court found that because plaintiff had "*failed to show* that the bank unreasonably required her guaranty for a loan that was being made to a corporation whose sole shareholder was her husband who had personally guaranteed the loan" summary judgment in favor of the bank was appropriate.[39]  However, the court reached this decision because plaintiff had offered  "no evidence *whatsoever* to establish that the corporation would have qualified for the loan without consideration of

---

[35]*Mattiesen v. Banc One Mortgage Corp.*, 173 F. 3d 1242, 1246 n. 4 (10th Cir. 1999)("Because the resolution of that issue is determinative here, we do not reach the question of whether the *McDonnell Douglas* standard applies in credit discrimination cases."); *Duran v. Community First National Bank*, 92 Fed. Appx. 756, 760 n. 1 (10th Cir. March 22, 2004) ("It is an open question in this circuit whether the *McDonnell Douglas* burden shifting analysis applies to ECOA claims.  We need not decide the issue here because Mr. Duran has not carried the burden under either the *McDonnell Douglas* analysis or a traditional proof analysis.").

[36]*Estate of Hilgert v. Mark Twain/ Merchantile Bank*, No. 99-2031-GTV, 2000 U.S. Dist. LEXIS 5922 at *5 (D. Kan. April 19, 2000)(citing *Mattiesen v. Banc One Mortgage Corp*., 173 F. 3d 1242, 1246 n. 4 (10th Cir. 1999)). *See also Duran*, 92 Fed. Appx. at 760 n. 1.

[37]*Id.*; *Matthiesen*, at 1246 ("The district court held plaintiff had failed to establish a prima facie case because she had not proven that she was qualified for the loan.  We agree."); *Duran*, 92 Fed. Appx. at 760 n. 1 ("Because Mr. Duran cannot demonstrate that he was qualified for the loan, he cannot establish his prima facie case and his claim must fail.").

[38]*FDIC v. 32 Edwardsville*, *Inc*., 873 F. Supp. 1474, 1381 (D. Kan. 1995).

[39]*Id.*

13

*property jointly* held by Mr. and Mrs. Miller."[40]  Indeed, none of these cases involved § 207.2(d)(5).  Here, under either the basic proof analysis or *McDonell Douglas* burden shifting, summary judgment is inappropriate because genuine issues of material fact exist as discussed below.

**2.      Discussion**

The court finds genuine issues of material fact exist as to whether (1) defendant's determination that Mr. Boyd was not independently creditworthy occurred before it requested plaintiff to guaranty the Encore loans;[41] (2) Mr. Boyd was independently creditworthy; and (3) whether defendant required plaintiff to act as a guarantor in violation of 12 C.F.R. § 202.7(d)(5).

**a.      Time Line**

On March 2, 2004 defendant prepared the Proposed Term Sheet for the Encore loans.  The term sheet contains a provision that *both* Mr. Boyd and Plaintiff would provide a guaranty for the loans.[42]  On March 5, 2004, defendant drafted the Credit Summary, evaluating the proposed Encore loans.  This Credit Summary indicated that plaintiff had a liquid worth exceeding 2 million dollars and that Mr. Boyd would act as the sole guarantor for the Encore loans.  The Credit Summary did not mention plaintiff or any joint assets between plaintiff and Mr. Boyd.  The next date is less clear, but both parties agree that sometime prior to March 22, 2004, Mr. Boyd provided financial information, though not formally, to the Bank.[43]  However, Mr. Boyd testified that he did not discuss with the bank whether he jointly owned any assets with plaintiff.[44]  On March 19, 2004, defendant prepared the Commitment letter and on March 22, 2004 Mr.

---

[40]*Id.* (emphasis added).

[41]*FDIC v. Medmark, Inc.*, 897 F. Supp. 511, 515 (D. Kan. 1995)(citing *Riggs Nat'l Bank of Washington D.C. v. Linch*, 36 F.3d 370, 374 (4th Cir. 1994)).

[42]Motion for Summary Judgment (Doc. 37) at (Exhibit D).

[43] *Id.* at (Exhibit B).

[44]Exhibits in Support of Memorandum in Opposition (Doc. 47) at (Exhibit B).

Boyd executed the Commitment.[45]   The Commitment contains the same requirement of a guaranty from *both* Mr. Boyd and plaintiff.[46]   Two days later, on March 24, 2004, Mr. Boyd provided defendant with a personal financial statement ("PFS") which had been filled out by Mr. Boyd and was signed by him and plaintiff.  Mr. Boyd's name appears in the "Applicant" section and plaintiff's name is listed in the "Co-Applicant" section.[47]   The PFS provided formal written information about certain financial assets.[48]   On April 1, 2004 both Mr. Boyd and Plaintiff executed the Guaranty.[49]

### b.       The Personal Financial Statement

Both sides are quick to argue that Mr. Boyd's and plaintiff's PFS was not a joint application for credit, despite the fact plaintiff's name appears in the co-applicant section.[50]   Mr. Boyd testified that his only discussion with plaintiff regarding the PFS was his informing plaintiff "the bank needs *us* to sign this so *we* can get the loans closed."[51] However, Mr. Boyd gave his  "joint assets" with plaintiff as the reason he did not fill out the PFS as an individual.[52]

---

[45]*Id.* at (Exhibit D).

[46]*Id.* at (Exhibit E).

[47]*Id.* at (Exhibit G)(Personal Financial Statement).

[48] *Id.*

[49] *Id.* at (Exhibit I). Plaintiff claims that defendant violated ECOA on April 1, 2007 when plaintiff executed the Guaranty.  *See* Memorandum in Opposition (Doc. 46) at p. 22.

[50]*See e.g.*, Reply (Doc. 53) at p. 13; 12 C.F.R. § 202.7(d)(1) ("[a] creditor shall not deem the submission of a joint financial statement or other evidence of jointly held assets as an application for joint credit.).

[51]Motion for Summary Judgment (Doc. 37) at (Exhibit B)(emphasis added).

[52]*Id.*

Essentially, the crux of defendant's argument is that in receiving this PFS, defendant "knew of the joint assets"[53] such that, pursuant to § 202.7(d)(2), plaintiff's guaranty was "reasonably believed by [defendant] to be necessary, under the law of the state in which the property is located, to enable the creditor to reach the property being relied upon in the event of the death or default of the applicant."[54] Defendant emphasizes that it does not matter if, in fact, Mr. Boyd could have met its $2 million in liquid marketable assets' requirement. Rather, defendant argues the only determination that is important is whether defendant's requirement of plaintiff to act as a guaranty was reasonable.

To that end, defendant also argues the fact that the Proposed Term Sheet and the Commitment required both Mr. Boyd and plaintiff to act as guarantors is irrelevant, because when the Bank received the PFS, before plaintiff actually executed the Guaranty, the Bank reasonably relied on the PFS to require plaintiff to execute the guaranty. Defendant contends "[t]he answer to whether Mr. Boyd had $2 million of liquid assets from which the Bank could collect upon default is contained in the four corners of the [P]FS."[55]

As defendant bases its motion on its "reasonable" belief in the necessity of plaintiff's guaranty solely from the information provided in the PFS,[56] the court finds the actual text of the PFS particularly helpful. The PFS contains no separate section for the "Co-Applicant" to list assets. Rather the PFS asks, from whom it is unclear, for a list of certain assets including: Cash, Securities, Life Insurance Cash Value, Mortgages and Contracts, Homestead, Other Real Estate, Prof Sharing & Pension, Retirement Accounts, Automobile, Personal Property, and Other Assets. The PFS lists the following assets on the first page:

---

[53]Memorandum in Support (Doc. 38) at p. 3 n.4.

[54]*Id.* at p. 6 (citing 12 C.F.R. § 202.7(d)(2)).

[55]Reply (Doc. 53) at p. 6.

[56]*See e.g.*, Memorandum in Support (Doc. 38) at p. 12.

16

| | |
|---|---|
| Cash: | $1,315,000 |
| Securities: | $885,000 |
| Homestead: | $420,000 |
| Other Real Estate: | $425,000 |
| Profit Sharing & Pension: | $348,000 |
| "Business Ownership–Encore Products" | $935,000 |
| Other Assets (Describe) | $1,000,000 –marketable sec. |
| | $278,000–real estate |
| | (Brookwood Partners, Simpson Inv. 6) |

After subtracting $50,000 as the only liability, the PFS lists "Total Assets Less Total Liabilities"), or Net Worth as $5,556,000.

The PSF also provides "Schedules" for more specific information regarding assets and liabilities. Schedule 1 regarding Cash, lists $ 875,000 in a checking account and $440,000 in two money market accounts.   Schedule 2, regarding Securities, lists $737,000 in securities "Registered in the Name(s) of" "Nina, kids" and $148,000 in securities "Registered in the Name(s) of" "Nina."   Schedule 5, regarding Real Estate Owned, under "Property Description" it lists "12425 Howe" Current Value: $420,000, "T-10 Lake Lotawona" Current Value: $350,000, and "Osage Heights" Current Value: $75,000.   Other than these "Property Description[s]" nowhere in the PFS does it list the location of any property.   Schedule 6, regarding Profit Sharing and Pension, lists a 401K with $310,000 of "Totally Vested" and "CRB" listed next to it and two IRAs, one for $19,000 "Totally Vested" and "CRB" listed next to it and one for $18,000 "Totally Vested" with "NSB" listed adjacently.[57]

Despite the fact that the form provides for a "Co-Applicant", except as to "Securities" on Schedule 2, the form does not ask for the applicant to list the name of the person in whose name the property is listed. Moreover, no Schedule is available for an applicant and/or co-applicant to list in detail "Other Assets."

---

[57]Defendant contends that NSB are plaintiff's initials, while CRB are Mr. Boyd's.   *See* Reply (Doc. 53) at p. 13.

### c.    Creditor's Standards of Creditworthiness

12 C.F.R. § 202.7(d)(1), provides "[a] creditor shall not require the signature of an applicant's spouse or other person, other than a joint applicant, on a credit instrument if the applicant qualifies *under the creditor's standards of credit worthiness* for the *amount* and *terms* of the credit requested."[58] Defendant is permitted to apply its own criteria for determining creditworthiness as long as it is based on criteria which are valid, reasonable, and non-discriminating with regards to the applicant's marital status.[59]

Here, defendant determined that the credit requirement for the Encore loans was $2 million in *liquidity*. Specifically, "Guarantor will be required to maintain a minimum amount of $2,000,000 in *liquid marketable assets*."[60] Plaintiff does not dispute that this 2 million dollar liquid marketable asset requirement was valid, reasonable, and non-discriminating,[61] and the court agrees. Defendant refrains for defining "liquid marketable assets", but the court notes that generally "liquid assets" are "cash, or assets readily convertible to cash."[62]

### d.    Defendant's calculation of Mr. Boyd's creditworthiness based on the PFS

Defendant argues that it "looked at the [P]FS to determine whether under state law, upon default the Bank could collect $2 million based on the assets Mr. Boyd listed. The [P]FS clearly shows virtually no assets that Mr. Boyd owned by himself that were not exempt, and therefore, the assets that Mr. Boyd owned

---

[58] 12 C.F.R. § 202.7(d)(1)(emphasis added).

[59] *Haynes v. Bank of Wedowee*, 634 F.2d 266, 270 (5th Cir. 1981).

[60] Motion for Summary Judgment (Doc. 37) at (Exhibit D) p. 2; (Exhibit E) (emphasis added). *See also* Memorandum in Opposition (Doc. 45) at (Exhibit 6) p. 2 ("Guarantor will be required to enter into a liquidity maintenance agreement of $2MM to further reduce the risk associated with this start up.").

[61] *See* Plaintiff's Memorandum in Opposition (Doc. 45).

[62] *Black's Law Dictionary* 930 (6th ed. 1991).

himself did not satisfy the Liquidity Requirement."[63] Again, plaintiff and her husband claim they were never told by the Bank that Mr. Boyd's assets did not meet the threshold of creditworthiness without consideration of plaintiff's financial condition.   So too, defendant offers no evidence as to how, or even when, its representatives assessed the PFS.  Rather, defendant merely asserts that within the "four corners" of the PFS it is clear that defendant could not meet the liquidity requirement without having plaintiff act as a guarantor. At the heart of defendant's characterization of it's assessment of Mr. Boyd's creditworthiness is its contention that whether the property listed in the PFS was located in Missouri or Kansas does not matter because Mr. Boyd could not meet the 2 million dollar  liquidity requirement either way.

### i.        Exempt assets

First, defendant says plaintiff could not use any assets that would be exempt, or unreachable by unsecured creditors in the event of default or death, to meet the 2 million dollar liquidity requirement. Specifically, defendant notes that in Missouri and Kansas, retirement  accounts are exempt from collections by unsecured creditors as are Kansas homesteads.[64]  The court agrees that in the event of death or default, defendant, as an unsecured creditor, could not reach the retirement accounts in Schedule 6, which under either Missouri or Kansas law were exempt, or the parties' exempt homestead in Schedule 5, which was located in Kansas.[65]

---

[63]Memorandum in Support (Doc. 38) at p. 12.

[64]*Id*. at p. 8 (citing Mo. Rev. Stat. §§ 513.430(10)(e),(f)); *id.* at p. 8 (citing Kan. Stat. Ann. §§ 60-2301-2308(b)).

[65]Memorandum in Support (Doc. 38) at (Exhibit G).

ii.      "Liquidity"

Defendant explains its creditworthiness standard as to the Encore loans as requiring "that a grantor or additional obligor . . . have assets with a *liquid* value of $2 million."[66]  To that end, defendant explains it did not consider Mr. Boyd's "Business Ownership" of Encore because "[i]f Encore defaulted, the Bank would liquidate Encore's assets because it would have a security interest therein, and as a result of the liquidation, Mr. Boyd's interest in Encore would be valueless."[67]

Further, defendant asserts it did not take Mr. Boyd's interest in the "Missouri real estate" into account because his interest was not *liquid* in nature.  Defendant indicates that it did not value the property located in Missouri even under the Guaranty as "the Bank's review of the [P]FS showed liquid assets to meet the *Liquidity Requirement* of under 1.6 million[68] if the securities were located in Kansas, and $657,500[69] if the securities were located in Missouri.  With the Guaranty, the [P]FS showed liquid assets to meet the Liquidity Requirement of over $2 million."[70]

Thus, it appears, in determining Mr. Boyd's creditworthiness the defendant considered only the $1,315,000 in cash, $885,000 in securities owned only by plaintiff, or plaintiff and her children, and $1,000,000 in "marketable" securities listed only on the assets section of the first sheet of the [P]FS. Defendant argues that whether the cash and the securities were located in Missouri or Kansas, and no matter whose name they were listed under, Mr. Boyd could not have met the 2 million liquidity requirement.  However, what defendant ignores, but what the court cannot, is that in merely asking the

---

[66] *Id.* at p. 5.

[67] Motion for Summary Judgment (Doc. 37) at p. 4.

[68] Or half of $1,315,000 cash ( or $657,500) plus half of $1,885,000 in securities ($885,000 from securities (Schedule 2) and 1,000,000 in marketable securities (listed under "Other assets")) (or $942,500) equals 1.6 million.  ($657,500+$ 942,500= $1,600,000).

[69] Or half of the 1,315,000 in cash.

[70] Memorandum in Support (Doc. 38) at p. 10 (emphasis added).

court to look at the "four corners" of the PFS defendant has not established definitively that defendant could "reasonably" seek a guaranty from plaintiff.

    **e.**    **Did the Bank "reasonably" require plaintiff to execute a guaranty?**

Again, defendant asserts summary judgment is warranted because, based solely on the PFS, defendant met the requirements of § 202.7(d)(2) which provides:

> [i]f an applicant requests unsecured credit and relies *in part* upon property that the applicant owns *jointly* with another person to satisfy the *creditor's standards of creditworthiness*, the creditor may require the signature of the other person only on the instrument(s) necessary, or reasonably believed by the creditor to be necessary, *under the law of the state in which the property is located*, to enable the creditor to reach the property being relied upon in the event of the death or default of the applicant.[71]

Under the Official Comments to 12 C.F.R. § 202.7(d)(2) if the applicant seeking unsecured credit does not "own sufficient *separate* property" and "relies on *joint* property to establish creditworthiness" then "the creditor *must value* the applicant's interest in the jointly owned property."[72]  To determine the value of an applicant's interest in jointly owned property, "a creditor *may* consider factors such as the form of ownership and the property's susceptibility to attachment, execution, severance, or partition; the value of the applicant's interest after such action and the cost associated with the action."[73]  However, "a creditor may not consider the possibility that the couple may divorce."[74]

Here, the court finds that a material issue of fact exists as to whether based *solely* on the PFS, it was necessarily reasonable to assume that Mr. Boyd's liquid assets were joint such that under the laws of the particular state where the property was located, defendant could reasonably require plaintiff to act as a

---

[71]12 C.F.R. § 202.7(d)(2)(emphasis added).

[72]68 Fed. Reg. 13,144 (emphasis added).

[73]*Id.* (emphasis added).

[74]*Id.*

guarantor.  The PFS does not indicate in whose name the $1,000,000 in "marketable securities" or the $1.35 million in cash were listed or in what state they were located.  Defendant appears to argue that it was plaintiff and Mr. Boyd's responsibility to list this kind of information.  Specifically, defendant argues:

> none of the other valuable assets set forth in the [P]FS: Schedule 1–"cash"–Schedule 5–Real Estate–are listed as separately owned or owned by an entity.  Since the Boyds knew how to designate, and in fact designated, assets owned by an entity and assets that were individually owned, in review the [P]FS, it was perfectly reasonable for the Bank to assume that the assets in Schedules 1 and 5 not identified as owned solely by one or the other of the Boyds were jointly owned.[75]

The court finds defendant's argument unpersuasive considering (1) the PFS did not ask for the Applicant or Co-Applicant to specify under whose name the cash or the $1,000,000 in securities were listed or in what state they were located; (2) defendant did not present any evidence that it ever asked Mr. Boyd to submit information regarding plaintiff's assets, or to identify the assets he and plaintiff owned jointly, in the first place; and (3) the Bank has not established when, how, or if its representatives reviewed the PFS prior to plaintiff's execution of the Guaranty.  In fact, both Boyds testified that the $1,000,000 in marketable securities were not joint, rather they were owned solely by plaintiff.  Moreover, the Official Comments place the responsibility on the creditor to "value" the applicant's interest in the jointly owned property, and defendant has presented no affidavit or other evidence in support of its motion for how it actually, prior to plaintiff's execution of the Guaranty, "valued" Mr. Boyd's interest in assets it assumed were joint.[76]  Indeed, the only starting point for such a requirement would be a determination of whether the assets at issue were, in fact, "joint."

Here, the court finds that a question of fact exists as to whether defendant could have reasonably required plaintiff to act as a guarantor pursuant to 12 C.F.R. § 202.7(d)(2).  Specifically,  the court finds a

---

[75]Reply (Doc. 53) at p. 13.

[76]As plaintiff notes "[t]here is not a single piece of paper, out of the 2,849 pages of produced documents, that purports" to demonstrate that or how the bank "valued" Mr. Boyd's interest in allegedly joint property.  Memorandum in Opposition (Doc. 46) at p. 16.

genuine issue of material fact exists as to whether defendant "made [the] determination that [the] husband was not independently creditworthy before it requested [the] wife to guarantee [the] loan."[77]

### f.   Did Mr. Boyd meet defendant's standards of creditworthiness in the first place?

However, in order to prevail on claim brought under 12 C.F.R. § 202.7(d)(1) plaintiff must demonstrate that Mr. Boyd, the applicant, "was a qualified borrower in the first place.'"[78] At the outset the court finds defendant's 2 million dollar liquid marketable asset requirement was valid, reasonable, and non-discriminating. However, the court finds a genuine issue of material fact exists as to whether Mr. Boyd met this creditworthiness requirement. Mr. Boyd testified that the $1,350,000 was available at his signature only. Moreover, the Bank's creditworthiness requirement did not indicate that the liquid marketable assets had to be "non-exempt" such that Mr. Boyd's 401K of $310,000 and IRA of $18,000, assets listed on the PFS solely in Mr. Boyd's name, could not be included. So too, the trier of fact could conclude that plaintiff's $935,000 in "Business Ownership–Encore Products" as a liquid asset could be considered as well. The "2 million in liquid marketable assets" only offers so much guidance as to what could determine plaintiff's creditworthiness, and without further evidence as to what defendant actually required or how it evaluated Mr. Boyd, the court believes a determination at the summary judgment stage that Mr. Boyd was never creditworthy in the first place would be premature, if not inaccurate. Moreover, it is undisputed that defendant never informed Mr. Boyd that he was not independently creditworthy. Indeed, the Credit Summary listed Mr. Boyd's liquid assets as $2,291,000.00. The financial statement this figure was based on has not been provided to the court.

---

[77]*FDIC v. Medmark, Inc.*, 897 F. Supp. 511, 515 (D. Kan. 1995)(citing *Riggs Nat'l Bank of Washington D.C. v. Linch*, 36 F.3d 370, 374 (4th Cir. 1994)).

[78]*Mattiesen v. Banc One Mortgage Corp.*, 173 F. 3d 1242, 1246 n. 4 (10th Cir. 1999)("The district court held plaintiff had failed to establish a prima facie case because she had not proven that she was qualified for the loan. We agree."); *Duran*, 92 Fed. Appx. at 760 n. 1 ("Because Mr. Duran cannot demonstrate that he was qualified for the loan, he cannot establish his prima facie case and his claim must fail.").

A review of plaintiff's and Mr. Boyd's testimony, the ambiguity as to how the bank would evaluate Mr. Boyd's creditworthiness, along with the difference in financial figures reflected in the PFS and the Credit Summary all lead the court to believe a genuine issue of material fact exists as to whether plaintiff was creditworthy.

### g. Did the Bank "require" plaintiff to act as a guarantor in violation of § 202.7(d)(5)?

Defendant mistakenly characterizes the $885,000 in securities as joint.[79]   However, despite defendant's characterization, the PFS states that the $885,000 in securities were only listed in plaintiff and her children's names, not Mr. Boyd.  Defendant characterizes plaintiff's Guaranty as a "permitted guaranty of *joint* property owners that was necessary to meet the Liquidity Requirement based on *joint* assets, . . . and is completely permitted under ECOA and § 202.7(d)(2)."[80] Yet, under defendant's calculation, Mr. Boyd needed the $885,000 in securities in order to meet the 2 million liquidity requirement, securities expressly listed on the PFS as owned by plaintiff.  As such, the court believes §207.2(d)(5) applies.

Defendant illogically argues that 202.7(d)(5) is "not the subject of the summary judgment process."[81] However, the Pretrial Order lists "[t]he Bank was entitled to receive a guaranty from Nina Boyd pursuant to 12 C.F.R. § 202.7(d)(5)" as one of defendant's defenses.[82]  Moreover, in plaintiff's Complaint and the parties'

---

[79] For example, defendant explains that the only "non-exempt assets *jointly owed* with Plaintiff-- cash - $1,315,000 (schedule 1); securities - $885,000 (schedule 2); Missouri real estate–$425,000 (schedule 5)."Memorandum in Support (Doc. 38)  at p. 9 (emphasis added).

[80]*Id.* at p. 13 (emphasis added).

[81] *See* Reply (Doc. 53) at p. 18 n. 23.  Plaintiff is using 202.7(d)(5) to *survive* summary judgment. That defendant has not used 202.7(d)(5) as a basis for summary judgment is not surprising.

[82]*See* Pretrial Order (Doc. 30) at p. 9.

Pretrial Order plaintiff contends defendant violated 12 C.F.R. § 202.7(d) without regard to a specific section.[83]

In response to the instant motion, plaintiff specifically argues that defendant violated § 202.7(d)(5).[84]

> 12 C.F.R. § 207.2(d)(5) provides:
>
> > If, under a *creditor's standards of creditworthiness*, the personal liability of an additional party is *necessary* to support the credit requested, a creditor may request a cosigner, guarantor, endorser, or similar party. The applicant's spouse *may* serve as an additional party, but the creditor *shall not require* that the spouse be the additional party.[85]

The Official Comments to § 207.2(d) explain the intersection between (d)(1) and (d)(5). As to an "[u]nqualified applicant" or "when an applicant requests individual credit but does not meet a creditor's standards" then "the creditor may require a cosigner, guarantor, endorser, or similar part[y]-but *cannot require that it be the spouse*."[86] The Official Comments also explain:

> [i]f the applicant's interest in jointly owned property does not support the amount and terms of credit sought, the creditor may offer the applicant other options to qualify for the extension of credit. For example:
>
> A.  Providing a co-signer or other party (§ 202.7(d)(5)),
>
> B.  Requesting that the credit be granted on a secured basis (§ 202.7(d)(4)); or
>
> C.  Providing the signature of the joint owner on an instrument that ensures access to the property in the event of the applicant's death or default, but does not impose personal liability unless necessary under state law (such as a limited guarantee). A creditor may not routinely require, however, that a joint owner sign an instrument (such as a quitclaim deed) that would result in the forfeiture of the joint owner's interest in the property.

Here, defendant argues that only by using the $855,000 in securities, which the PFS clearly states were only owned by plaintiff, could Mr. Boyd achieve the liquidity requirement. Plaintiff has provided some evidence that Mr. Boyd was creditworthy. However, if defendant is to be believed, and if the trier of

---

[83]*See* Complaint (Doc. 1) at p. 3; Pretrial Order (Doc. 30).

[84]Memorandum in Opposition (Doc. 46) at p. 13.

[85]12 C.F.R. § 202.7(d)(5)(emphasis added).

[86]68 Fed. Reg. 13,144.

fact finds Mr. Boyd was not creditworthy, under defendant's calculation of its standard of creditworthiness for 2 million dollars in liquid market assets, "the personal liability of an additional party" or plaintiff "[was] *necessary* to support the credit requested" and thus defendant could seek but not *require* plaintiff to execute the guaranty.

Both Boyds testified that defendant never discussed with either of them the possibility of using any other person or entity as a guarantor for the loan, in lieu of plaintiff.   Moreover, Mr. Boyd has testified, and defendant has not refuted, that prior to the March 2, 2004 Proposed Term Sheet and the March 19, 2004 Commitment wherein defendant listed plaintiff as a guarantor, Mr. Boyd did not provide defendant with any information regarding plaintiff or their jointly owned assets.  Thus, whether defendant did, in fact, "require" plaintiff to execute the guaranty is a material issue of fact.

### 3.    **Negligent Loan Administration**

For plaintiff to prevail in her claim of negligence she must show defendant had a duty of care which it breached and that plaintiff suffered damage as a result.[87]

#### a.    **Standing**

Defendant argues plaintiff lacks standing to challenge its administration of the loan and cites *Continental Ill. Nat'l Bank & Trust Co. of Chicago v. Windham*, a case from the Eastern District of Texas, in support.   In *Windham*, the court stated guarantors could not assert certain personal defenses of the obligor such as: usury, breach of warranty, incapacity of principal, statute of limitations, forgery of maker's signature, carelessness of bank in issuing loan, mistake, impossibility, or frustration of purpose.[88]   Plaintiff

---

[87] *Davey v. Hedden*, 260 Kan. 413, 426 (1996).  Defendant also argues that plaintiff has waived her right to seek a negligence claim.  Because the court finds summary judgment appropriate on this claim for other reasons, the court will not address whether plaintiff waived her right to seek such a claim.

[88] 668 F. Supp. 578, 584-585 (E.D. Tex. 1987).

counters that a guarantor may assert defenses available to the primary obligor and any defenses that arise out of the guarantee obligation.[89]

The parties have failed to cite, and the court has not found, any Kansas case directly addressing whether a guarantor can use her principal's claims to set-off the guarantor's own obligation.  However, in *Pawnee Petroleum Products, LLC v. Crawford*, a case from the District of Kansas, the Honorable Judge Bostwick stated that under the "widely accepted" rule[90] such set-off is permissible because "equity demands that the guarantor be able to use claims and defenses of an insolvent principal in order to arrive at the true debt to which the guarantor should be held."[91]  To hold otherwise and bar a guarantor from asserting claims and defenses stemming from the underlying transaction would allow unscrupulous creditors to prevail on nonmeritorious claims by suing the guarantor instead of the defaulting principal.[92]

Here the court finds that Encore Products is insolvent, as is Mr. Boyd, and plaintiff as guarantor of Encore's loan has standing to bring a claim for negligent loan administration.

### b.  No duty to police the loan existed

Defendant argues that it did not have a duty to monitor the administration of the Encore Loan, and the court agrees.  Kansas courts have found that in a debtor-creditor relationship the debtor has no duty to *police* the loan outside of an explicit obligation created by contract.  In *Daniels v. Army National Bank* the Kansas Supreme Court found the bank had no duty to inspect a construction project even after being

---

[89] *See e.g.*, *Allied Supermarkets, Inc. v. Semaan*, 951 F.2d 718, 728 (6th Cir. 1991).

[90] *Pawnee Petroleum Prods. v. Crawford*,  Case No. 01-1314, 2003 U.S. Dist. LEXIS 12164, at *3 (D. Kan. April 18, 2003)(citing *Fist Texas Serv. Corp. v. Roulier*, 750 F. Supp. 1056, 1061 (D. Colo. 1990); *Cont'l Group, Inc. v. Justice*, 536 F. Supp. 658, 661 (D. Del. 1982)).

[91] *Id.* at n. 5.

[92] *Id.*

informed of substantial defects in the construction.[93]  Specifically, the Kansas Supreme court "followed" "[t]he traditional rule" that "the lender-borrower relationship creates no special duty."[94]  In *United States v. Wells*, a District of Kansas case, the court noted "in ordinary lender-borrower situations, the relationship is a debtor-creditor relationship governed by the contract, and that additional tort duties of care will not be imposed."[95]  Moreover, the cases plaintiff cites to bolster her contention that a duty exists in the instant case involve instances wherein the duty to supervise was afforded contractually[96] or wherein a duty existed as to intentional misconduct[97] or supervision of the loan *application* process, not administration.[98]

Plaintiff does not argue, and the court does not find, that a duty to police the loan existed in any contract between plaintiff and defendant or Mr. Boyd and defendant.  None of the loan documents, including the loan agreements and the Guaranty, contain language establishing a general or specific duty to monitor the Encore loans.  The Guaranty is silent as to defendant's duty to the guarantor, and in fact it disclaims such a duty by having plaintiff waive certain rights.  Further, while the loan agreements mention "Borrowing Base," the documents do not require, or imply, that defendant will assure the accuracy of the Borrowing Base.

---

[93] 822 P. 2d 39, 43 (Kan. 1991).

[94] *Id.*

[95] No. 96-1028-JTM, 1998 U.S. Dist. LEXIS 1175 at *10-11 (D. Kan. Jan. 30, 1998).  *See also id.* ("This court has recognized that 'Kansas courts are hostile toward any attempt to impose special duties on financial institutions.").

[96]*Citizens Marine Nat'l Bank v. U.S. Dept. of Commerce*, 854 F. 2d 228 (7th Cir. 1988)(wherein the guaranty provided the bank would take such action as "reasonable and prudent commercial bank"); *Brunswick Bank & Trust Co. v. United States*, 707 F.2d 1355, 1363 (Fed. Cir. 1983).

[97] *In re Allied Supermarkets, Inc.*,  951 F. 2d 718, 728 (6th Cir. 1991).

[98] *Jacques v. First Nat'l; Bank of Md*,  307 Md. 527, 540 (1986)(finding that a bank had a duty to use reasonable care when processing a loan *application*);  *Citizens Marine Nat'l Bank v. U.S. Dept. of Commerce*, 854 F. 2d 228 (7th Cir. 1988)(finding a bank had a duty of due care when *evaluating* a potential borrower).

28

The court also finds plaintiff's attempts to apply cases from outside Kansas, this District, and this Circuit involving instances of intentional misconduct or conduct occurring during the loan application process unpersuasive.  As no duty existed, it does not matter that defendant *could* have known the BBRs were filled out incorrectly.  Mr. Lagoski testified that defendant never instructed him on the process of filling out BBRs, much less intentionally misinstructing him.

### c.    Mr. Rabe had authority to draw on the Encore Line of Credit.

Plaintiff argues defendant allowed Mr. Rabe and Mr. Lagoski to make draws on the Encore line without authority to do so.  While Mr. Boyd was the signatory to the Encore loans, the loans were made to Encore Products, LLC of which Mr. Rabe was the president.  As president, Mr. Rabe was authorized to run the day to day business of Encore.[99]  Mr. Boyd described Mr. Rabe's role in Encore as being "entrusted with the property of Encore, including . . . Encore's bank accounts and cash.  The cash . . . [was] proceeds of Encore's line of credit at U.S. Bank. . . . [Mr.] Rabe had authority to issue checks and make transfers to and from Encore bank accounts. . . . "[100] According to Mr. Boyd, Mr. Rabe was responsible for the entire company and in charge of sales and accounting.  Further, Mr. Boyd was aware that Mr. Rabe was an authorized signatory on the Encore Bank Account. He knew Mr. Rabe was making draws on the account to purchase raw material for Encore, was writing checks on the Encore Bank Account, and that BBRs were submitted in conjunction with the draws on the credit Line.[101] Mr. Boyd assumed that draws on the Line were being made because "that's how the business was set up.  Once we started production, we were going

---

[99] Memorandum in Support (Doc. 38) at (Exhibit A) (Operating Agreement); *id.* at (Exhibit B)(Mr. Boyd's deposition).

[100]*Id.* at (Exhibit Q)(Mr. Boyd's affidavit).

[101]*Id.* at (Exhibit B)(Mr. Boyd's deposition).

to need to draw on the line [.]"[102] However, Mr. Boyd never took steps to become aware of each individual draw.[103]

"In Kansas, 'what constitutes agency, and whether there is any competent evidence reasonably tending to prove such a relationship is a question of law.'"[104] Kansas law "recognizes two distinct types of agency–one actual, and the other, ostensible or apparent."[105] Actual authority may be express when the principal has delegated authority to the agent via words which expressly authorize the agent to complete a delegable act.[106] Actual authority may be implied "if it appears from the statements and conduct of the parties an other relevant circumstances that the intention was to clothe the agent with such an appearance of authority that when the agency was exercised it would normally and naturally lead others to rely on the person's acts as being authorized by the principal."[107] As to apparent authority:

> [T]he liability of the principal for the acts and contracts of his agent is not limited to such acts and contracts of the agent as are expressly authorized, necessarily implied from express authority, or otherwise actually conferred by implication from the acts of the principal. All such acts and contracts of the agent as are within the apparent scope of the authority conferred on him, although no actual authority to do such acts or to make such contacts has been conferred, are also binding upon the principal. Apparent authority . . . is what which though not actually granted, the principal *knowingly* permits the agent to exercise *or which she holds him out* as possessing. Accordingly, an apparent agent is one who, with or without authority, reasonably appears to third persons to be authorized to act as the agent of other.[108]

---

[102]*Id.*

[103]*Id.*

[104]*Rojo v. IBP, Inc.*, No. 03-3300, 2005 U.S. App. LEXIS 22846 (10th Cir. October 21, 2005)(*citing Brown v. Wichita State Univ.*, 217 Kan. 279, 540 P.2d 66, 74 (1975)).

[105]*Id.* (citing *Brown*, 540 P.2d at 74).

[106]*Id.* (citing *Mohr v. State Bank of Stanley*, 241 Kan. 42, 734 P.2d 1071, 1075 (Kan. 1987)).

[107]*Id.* (citing *Mohr*, 734 P.2d at 1075).

[108]*Id.* (citing *Mohr*, 734 P.2d at 1075)(emphasis in original).

Plaintiff argues that Mr. Rabe lacked the actual authority to draw on the Encore credit Line.  Yet, the court need not find Mr. Rabe had actual authority, either express or implied, as it is clear Mr. Rabe had apparent authority to draw on the Encore line of loans.  Mr. Boyd knew that Mr. Rabe was making draws on the Line and assumed that he would be as part of his duties as president of Encore.[109]  Mr. Boyd knowingly acquiesced to Mr. Rabe's draws on the Encore credit Line and held Mr. Rabe out to defendant as possessing that authority.[110]

Thus, even if there was a duty to police the loans, defendant did not breach that duty because it justifiably relied on the Mr. Rabe's apparent authority to make withdraws on the Encore Line of credit.  Because defendant had no duty to monitor the Encore loans and because, even if it did, defendant justifiably relied on Mr. Rabe's apparent authority to draw on the Encore credit Line, summary judgment in defendant's favor as to plaintiff's claim of negligent loan administration is warranted.

### 4.     Defendant's Counterclaim for the value of the loan

Defendant seeks summary judgement on its counterclaim as to the Guaranty.  Plaintiff argues that it may use defendant's alleged ECOA violation as a defense to defendant's counterclaim.[111]  Defendant does not address this issue in its briefing.  ECOA itself provides that courts "may grant such equitable and declaratory relief as is necessary to enforce the requirements imposed under" ECOA.[112]  Courts are split on whether the ECOA allows a guarantor to avoid her obligation under the guaranty.  Even in the District of

---

[109]Memorandum in Support (Doc. 38) at (Exhibit B).

[110]*See* 18B Am. Jur. 2d Corporations § 1343("if a president of a corporation has borrowed money without express authority from the corporate board of directors the corporation is nevertheless liable for the proceeds if it has accepted the borrowed money.").

[111]*See* Memorandum in Opposition (Doc. 46) at p. 33; Answer to Counterclaim (Doc. 5) at p. 2.

[112]15 U.S.C. § 1691e(c).

31

Kansas, courts have found both that "the ECOA does not provide for the invalidation of a guaranty as a remedy for an ECOA violation"[113] and that a party against whom the violation of ECOA has occurred can use the violation offensively to avoid their obligation on the debt.[114]

In *Silverman v. Eastrich Multiple Investor Fund*, the Third Circuit stated that the plaintiff guarantor may have a "valid defense" and could "obtain relief from her obligations under the Guaranty" because "[w]hile a violation should not void the underlying credit transaction, an offending creditor should not be permitted to look for payment to parties who, but for the ECOA violation, would not have incurred personal liability on the underlying debt in the first instance."[115]  The Third Circuit noted that even if the guaranty is voided, this would not "void the underlying debt obligation nor any other guaranties."[116]

---

[113]*FDIC v. 32 Edwardsville*, 873 F. Supp. 1474, 1480 (D. Kan. 1995).  This case relied in part on *Silverman v. Eastrich Multiple Investor Fund*, 857 F. Supp. 447, 453 (E.D. Pa. 1994) which was subsequently overturned.  See *Silverman v. Eastrich Multiple Investor Fund*, 51 F. 3d 28, 33 (3d Cir. 1995).

   *See also Hammons v. Ehney,* 924 S.W. 2d 843, 852 (Mo. 1996)(the "vast majority of cases considering relief available for violation of the ECOA have held that there is no authority in the statutory language for the proposition that a violation of the ECOA renders an instrument void."); *Resolution Trust Corp. v. Schonacher*, 844 F. Supp. 689, 695 (D. Kan. 1994) (the ECOA does not "grant courts the power to invalidate underlying obligations"); *Resolution Trust Corp. V. A.W. Assocs.*, 896 F. Supp. 1503, 1508 (D. Kan. 1994); *CMF Virgina Land v. Brinson*, 806 F. Supp. 90, 95 (E.D. Va. 1992)("Invalidation of the debt is a remedy too drastic for the Court to implement simply by reading between the lines of the EOCA); *Diamond v. United Bank & Trust*, 776 F. Supp. 542, 544 (N.D. Okla. 1991)("There is not authority, in statutory language or case law, for the proposition that a violation of the EOCA renders an instrument void"); *Riggs Nat'l Bank v. Linch*, 829 F. Supp. 163, 169 (D. Va. 1993) ("There is no express or implied language in the ECOA that grants this Court the 'sweeping power' to invalidate the underlying guaranty in this case.").

[114]*FDIC v. Medmark, Inc*., 897 F. Supp. 511, 514(D. Kan. 1995) (citing *Silverman*, 51 F. 3d at 33); *Bolduc v. Beal*, 994 F. Supp. 82, 92 (D. N.H. 1998)("An allegation of an ECOA violation can be raised as an affirmative defense against a creditor); *Integra Bank/Pittsburgh v. Freeman*, 839 F. Supp. 326, 329 (E.D. Pa. 1993)(ECOA violation should not void the underlying transaction, an offending creditor cannot look to the guarantor whose guaranty was improperly obtained).

[115]51 F.3d 28, 33 (3d Cir. 1995).

[116]*Id.*

Here, plaintiff is not seeking to void the underlying credit transaction,[117] rather plaintiff believes, and the court agrees, that if defendant violated the ECOA in requiring plaintiff to act as a guarantor, defendant should not be permitted to turn to plaintiff for payment when, but for the ECOA violation, she would not have incurred personal liability as to the underlying debt.  Because the court is persuaded by the analysis in *Silverman*, and the court has already found a material questions of fact exist as to whether defendant violated the ECOA, summary judgment as to plaintiff's obligation under the Guaranty is not warranted.

**II.     Motion to Enforce Jury Waiver Provision and to Strike Jury Demand (Doc. 31).**

The Guaranty signed by plaintiff waives "any and all right to trial by jury in any action or proceeding relating to this guaranty."[118]  Specifically, the jury waiver contained in the Guaranty  states:

> **Waiver of Jury Trial: THE GUARANTOR AND THE BANK HEREBY JOINTLY AND SEVERALLY WAIVE ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING RELATED TO THIS GUARANTY, THE OBLIGATIONS HEREUNDER, OR ANY TRANSACTION ARISING HERE FROM OR CONNECTED HERETO, THE GUARANTOR AND THE BANK EACH REPRESENTS TO THE OTHER THAT THIS WAIVER IS KNOWINGLY, WILLINGLY, AND VOLUNTARILY GIVEN.**[119]

Based on that agreement, defendant has moved to strike plaintiff's request for jury demand and seeks to enforce this jury waiver provision.

---

[117]However, because Encore and Mr. Boyd are both insolvent, defendant has nowhere else to turn to collect on the loan.

[118] Defendant's Motion to Enforce Jury Waiver Provision and to Strike Jury Demand, (Doc. 31) at p. 2.

[119]*See* Complaint (Doc. 1) at (Exhibit 6)(Guaranty).

A.    **Standard**

Parties may contractually waive the right to trial by jury.[120]  Such agreements are not per se illegal

or a violation of public policy.[121]  Some courts have found that "[i]t is well-established that a jury trial is

required in an action brought under the Equal Credit Opportunity Act."[122]  In *Vander Missen v. Kellogg-*

*Citizens National Bank*, the court reasoned that because ECOA permits a prevailing party to recover both

actual and punitive damages, forms of relief traditionally offered in the court of law, based on the Seventh

Amendment a "jury trial is required in an action brought under ECOA."[123]

However, even when a party has a right to a jury trial under the Seventh Amendment, such a right

can, under certain circumstances, be waived.  In *Telum, Inc. v. E.F. Hutton Credit Corp*. the Tenth Circuit

provided "[a]greements waiving *the right to trial by jury* are neither illegal nor contrary to public policy."[124]

For example, courts have held that "[a]lthough the right of trial by jury in civil actions is protected by the

Seventh Amendment to the Constitution, that right, like other constitutional rights, may be waived by prior

written agreement of the parties."[125]  Little to no case law discusses the intersection between a right to jury

trial under ECOA and whether it can be waived.[126] However, the court has no reason to believe that the

general presumption that a right to a jury trial afforded by the Seventh Amendment can be waived if done

---

[120]*Telum Inc. v. E.F. Hutton Credit Corp*., 859 F.2d 835, 837 (10th Cir. 1988).

[121] *Id.*

[122]*Davis v. Strata Corp*., 242 F. Supp. 643, 650 (D.N.D. 2003)(citing *Vandermissen v. Kellogg-Citizens National Bank of Green Bay*, 83 F.R.D. 206 (E.D. Wis. 1979).

[123]*Vandermissen*, 83 F.R.D. at 208.

[124] 859 F.2d 835 (10th Cir. 1988) (emphasis added).

[125]*RDO Fin. Servs. Co. v. Powell*, 191 F. Supp. 2d 811, 814 (D. Tex. 2002).

[126]Although, non-jury trials of ECOA claims have occurred.  *See e.g.*, *Mayes v. Chrysler Credit Corp*., 37 F.3d 9, 10 (1st Cir.)("[a] non-jury trial was held in the district court[.]").

so knowingly and voluntarily would be any different in an ECOA case.  Indeed, courts have applied this knowing and voluntarily standard to jury trial waivers in Title VII cases[127], which, as both sides noted in their summary judgment briefings, are closely related to a discrimination claim under ECOA.  As such, the court finds that the relevant inquiry in the present case asks whether the waiver was "knowing and voluntary."[128]

While the Tenth Circuit has not determined who carries the burden of demonstrating the knowing and voluntary nature of the waiver[129], "the majority of courts have decided that the burden lies with the party seeking to enforce the contractual waiver."[130]  In interpreting whether a waiver of jury trial was knowing and voluntary, courts often conduct a balancing analysis as to: (1) whether the clause containing the waiver was conspicuous; (2) whether there was a gross disparity in bargaining power between the parties; (3) the business or professional experience of the party opposing the waiver; and (4) whether the party opposing the waiver had an opportunity to negotiate contract terms. [131]

**B.     Discussion**

The court finds plaintiff knowingly and voluntarily executed the jury waiver.

---

[127]*See e.g.*, *Shappert v. Bedford, Freeman & Worth Publ'g Group*, No. 03-0058, 2004 U.S. Dist. LEXIS 14153 (S.D. N.Y. July 24, 2004)(applying this standard to plaintiff's Title VII and ADEA claims); *Brown v. Cushman & Wakefield, Inc.*, 235 F. Supp. 2d 291, 293-94 (applying the "knowing and voluntary" standard to plaintiff's Title VII claims).

[128]*Bevill Co. v. Sprint/United Mgmt. Co.*, No. 01-2524-CM, 2006 U.S. Dist. LEXIS 76295 at *2 (D. Kan. Oct. 11, 2006)(citing *Husey v. West*, 966 F.2d 579, 581 (10th Cir. 1992)).

[129]*Id.* (citing *Husey*, 966 F.2d at 581).

[130]*Id.* (citing *PostNet Int'l Franchise Corp. v. Amercis Int'l, Inc.*, 2006 U.S. Dist. LEXIS 42794 (D. Colo. June 26, 2006); *Phoenix Leasing Inc. v. Sure Broad., Inc.*, 843 F. Supp. 1379, 1384 (D. Nev. 1994)).

[131] *Phoenix Leasing, Inc.,* 843 F. Supp. at 1384 (D. Nev. 1994), *aff'd* 89 F.3d 849 (9th Cir. 1996); *see also Telum*, 859 F.2d at 837-38.

**1.      Conspicuousness**

Here, the court finds the language of the contractual provision unambiguous and understandable and conspicuous.  The location, on the second page of the two page Guaranty, did not amount to a waiver buried in the fine print of the document.  Further, defendant used all capital letters and bold print to state the waiver.[132]

**2.      Gross disparity in bargaining terms**

Plaintiff principally argues that she did not knowingly and voluntarily execute the jury waiver because of the gross disparity in bargaining power between herself and defendant.  This factor essentially considers whether the parties entered into the transaction on relatively even footing.  In a commercial situation, this requires *more* than the one party in need of funds or the services provided by the other party.[133]

In *Phoenix Leasing, Inc. v. Sure Board, Inc*., the court noted that unequal bargaining power alone should not necessarily invalidate an otherwise valid contractual waiver of the right to jury trial.[134]  The *Phoenix* court carefully considered the degree of unequal bargaining power "necessarily leading to a finding" of involuntary and unknowing waiver.  Specifically, the court noted:

> [t]he ability to take out a loan to start up a profit making . . . company is not a necessary of life such that Defendant was compelled to accept Plaintiff's loan on whatever terms it was offered.  The evidence before us does not indicate Defendant was in any difficulty or under some form of duress.  Defendant . . . could have simply declined the offered terms.  Nothing compelled Defendant to accept the loan on these terms, they were perfectly free to reject the deal.  This is not the kind of case that supports a 'necessitous men are not free men'

---

[132]*See e.g., Bevill Co. v. Sprint/United Mgmt. Co*., No. 01-2524-CM, 2006 U.S. Dist. LEXIS 76295 at *2-3 (D. Kan. Oct. 11, 2006) (finding a similarly worded provision "unambiguous and understandable" and finding bold lettering and all-capital type indicative of the "knowing" nature of plaintiff's decision).

[133]  *See Phoenix Leasing, Inc.*, 843 F. Supp. at 1385.

[134]  *Id.* (citing *Bonfield v. AAMCO Transmissions, Inc*., 717 F. Supp. 589, 596 (N.D. Ill. 1989)).

approach.   Nothing here calls on a court to rescue Defendant from a contract (or a contractual term) entered into knowingly and voluntarily.'[135]

In the instant case, plaintiff and Mr. Boyd were not required to accept financing from defendant, and in fact, had sought financing from other lenders, even receiving a verbal commitment from another lender.[136]  While Mr. Boyd had other options in pursuing financing, he chose U.S. Bank because of its favorable terms and interest rate.[137]  While it may be true that Mr. Boyd and plaintiff had very little bargaining power in choosing whether to execute a guaranty to gain financing from defendant, plaintiff and Mr. Boyd simply could have declined the offered terms.

Moreover, a disparity in bargaining power exists in most transactions between a commercial party and an individual, however, the relevant inquiry is whether this disparity was "gross"[138] as suggested by the Tenth Circuit.[139]  Here, the court finds it was not.

### 3.      The business or professional experience of the party opposing the waiver

Plaintiff chiefly argues that an unfair disparity of business and professional experiences between the parties means she did not knowingly and voluntarily execute the waiver.  Large disparities in education and familiarity with the commercial processes can permit an overreaching party to turn the other party's lack of knowledge into an unfair advantage.  As Mrs. Boyd is educated and familiar with business processes, such is not the scenario here.

---

[135]*Id.* (citation omitted).

[136] Memorandum in Support (Doc. 32) at (Exhibit 3)(Answer to Interrogatory No. 14); *id.* at (Exhibit 2)(Mr. Boyd Deposition).

[137]*Id.* at (Exhibit 2)(Mr. Boyd Deposition).

[138]*Bevill Co. v. Sprint/United Mgmt. Co.*, No. 01-2524-CM, 2007 U.S. Dist. LEXIS 32401 at *5-6 (D. Kan. April 30, 2007).

[139]*Id.* (citing *Telum*, 859 F.2d at 837).

Mrs. Boyd received a B.S. in Business from the University of Kansas and an M.B.A. from Dartmouth where Mrs. Boyd took classes in accounting, marketing, and finance.[140]  After graduation Mrs. Boyd worked at Maryland National Bank and was in training to become a commercial real estate loan officer.[141] So too, Mr. Boyd received an M.B.A. from Dartmouth and worked in the financial realm for several years.[142]

Plaintiff points out that she has been out of the workforce for twenty years and thus her previous experience means little.[143]  Plaintiff, however, does not cite, and the court has not found, any instance where a period of absence from the workforce negates a person's highly specialized education.  Similarly, plaintiff's husband, who plaintiff testified directly advised her to sign the Guaranty,[144] and who is also highly educated, has not been out of the workforce for twenty years.

### 4.    Opportunity to negotiate contract terms

The mere fact that "defendant may have rejected proposed changes to the waiver provision–if they had been proposed, which they were not–does not" necessarily alter the knowing and voluntary nature of plaintiff's waiver.[145]  Here, plaintiff could have negotiated different terms, or her husband, who negotiated various terms for the underlying loan, could have sought different terms in the instant case.  That they did not do so, or that if they had, defendant might have rejected them is too speculative of a basis to find the jury waiver was not knowingly or voluntarily given.

---

[140]Memorandum in Support (Doc. 32) at (Exhibit A)(Nina Boyd Deposition).

[141]*Id.*

[142] Memorandum in Support (Doc. 32) at (Exhibit B)(Chris Boyd Deposition).

[143]  *Id.* at (Exhibit A).

[144]  *Id.*

[145]*See Bevill Co. v. Sprint/United Mgmt. Co.*, No. 01-2524-CM, 2007 U.S. Dist. LEXIS 32401 at *4 (D. Kan. April 30, 2007)(citing *FDIC v. Ottawa Univ.*, 906 F. Supp. 601 (D. Kan. 1995)).

5.        **Scope of the jury waiver**

Plaintiff also argues that her ECOA claim is outside of the scope of the jury waiver provision.  The waiver provision states:

> **Waiver of Jury Trial: THE GUARANTOR AND THE BANK HEREBY JOINTLY AND SEVERALLY WAIVE ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING RELATED TO THIS GUARANTY, THE OBLIGATIONS HEREUNDER, OR ANY TRANSACTION ARISING HERE FROM OR CONNECTED HERETO, THE GUARANTOR AND THE BANK EACH REPRESENTS TO THE OTHER THAT THIS WAIVER IS KNOWINGLY, WILLINGLY, AND VOLUNTARILY GIVEN.**

Plaintiff contends that since the ECOA claim is merely an action for damages and injunctive relief flowing from the defendant's discrimination in forcing her to guarantee the loan and not an action to enforce the guaranty itself it is outside of the scope of the waiver.

Federal courts employ an array of tests to determine whether specific claims fall within a contractual provision like the one in the instant case.  The Tenth Circuit has not explicitly adopted a standard for defining the scope of a waiver provision.   However, based upon the tests employed by federal courts and pursuant to a plain reading of the language of the waiver, the court finds plaintiff's  ECOA claim is within the scope of the jury waiver provision.

a.        **Plain language**

First, the court notes that under the plain language of the waiver, plaintiff's ECOA claim falls within its scope.  The waiver provides that the guarantor waives her right to a jury trial in "*any* action or proceeding *related* to this guaranty, the obligations hereunder, or *any* transaction *arising* here from or *connected* hereto[.]" In the present motion plaintiff argues her ECOA claim does not relate to the guaranty or her obligations therefrom, yet in her Complaint and response to defendant's motion for summary judgment plaintiff paradoxically contends defendant's alleged violation of ECOA discharges her obligation

under the Guaranty.[146]  If read in a plain and ordinary manner, plaintiff's ECOA claim falls within the scope of the provision because it is "related to" the Guaranty.

> ### b.    Other standards

In *Efficient Solutions, Inc. v. Meiner's Country Mart*[147] the court found the jury waiver applied to the defendant's counterclaim because it related to the *subject matter* of the contract and *arose out* of the contract.  Similarly, in *Standard Wire & Cable Co., v. Ameritrust Corp*., the court found the waiver provision applied to claims that arose under the *same transaction* or *occurrence*.[148]  Under either test, plaintiff's ECOA claim would fall within the ambit of the jury waiver provision.  Here, plaintiff's ECOA claim clearly related to the subject matter of the Guaranty and arose out of the same transaction or occurrence as the Guaranty.

Using any of the aforementioned tests or a clear and plain reading of the waiver, the ECOA claim falls within the scope of the jury waiver provision and the court finds that the jury waiver applies to the instant case.  Accordingly,

 IT IS THEREFORE ORDERED that defendant's Motion for Summary Judgment (Doc. 37) is granted in part and denied in part.  As to plaintiff's claim for negligent loan administration, defendant's summary judgment motion is granted.

IT IS FURTHER ORDERED that defendant's Motion to Enforce Jury Waiver Provision and to Strike Jury Demand (Doc. 31) is granted.  The Clerk's office shall strike Demand for Trial by Jury (Doc. 3).  Any subsequent trial will be to the court.

---

[146]*See* Complaint (Doc. 1) at p. 4 (seeking "[a] declaration that Nina Boyd is not liable on the Continuing Guaranty [.]"); Memorandum in Opposition (Doc. 45).

[147] 56 F. Supp. 2d 982, 984 (W.D. Tenn. 1999).

[148]*See Standard Wire & Cable Co., v. Ameritrust Corp.*, 697 F. Supp. 368, 375 (C.D. Cal. 1988).

IT IS SO ORDERED

Dated this 26th day of September 2007, at Topeka, Kansas.

<u>s/ K. Gary Sebelius</u>
*K. Gary Sebelius*
U.S. Magistrate Judge